E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SHAWN T. ANDREWS (Cal. Bar No. 319565)
Assistant United States Attorney
Violent and Organized Crime Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6104
    Facsimile: (213) 894-3713
    E-mail:   shawn.andrews@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 18-774(A)-JAK-3 |
| Plaintiff, | CLOSING BRIEF REGARDING RELIABILITY OF DEFENSE EXPERT THERON VINES'S STRmix TESTIMONY |
| v. | |
| ALEJANDRO SANDOVAL, aka "Squeaky," | |
| Defendant. | |

## I. INTRODUCTION

"All scientific methods have limits. One must understand those limits to use a method appropriately." John M. Butler et al., DNA Mixture Interpretation: A NIST Scientific Foundation Review 1 (2021), nvlpubs.nist.gov/nistpubs/ir/2021/NIST.IR.8351-draft.pdf ("NIST Report"). At issue here are STRmix's limits. Specifically, the Court must determine whether defendant Alejandro Sandoval ("defendant") has demonstrated that STRmix operated within its limits when it produced the likelihood ratios ("LRs") defendant seeks to introduce at trial. To answer that question, defendant produced only

the testimony of Theron Vines, a novice STRmix user (See Tr. 89-90)[1] with no expertise in software programming (Tr. 211) and negligible training in statistics (Tr. 88-89.). And while Mr. Vines agrees with the proposition that all scientific methods have limitations (Tr. 107-108), he appears to believe that maxim does not apply to STRmix. (See Tr. 242.)

That belief likely explains Mr. Vines' failure to meaningfully address the crucial, undisputed fact that STRmix's pertinent analyses in this case were performed on approximately six picograms – or one cell's worth – of DNA. (Tr. 71, 73, 240.) As it stands, the record contains no evidence – aside from Mr. Vines' word – to demonstrate that STRmix can reliably analyze such tiny amounts of DNA. As discussed below, that absence of evidence means defendant has failed to carry his burden of showing that STRmix's LRs are reliable as applied to this case. Fed. R. Evid. 702(d). A fulsome evaluation of literature in the field of DNA mixture interpretation further buttresses that conclusion. There appears to be no published data that demonstrates STRmix's reliability with samples like the ones at issue here. In other words, STRmix was operating outside its validated limits in this case. Since "evidentiary reliability [is] based upon scientific validity[,]" Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590 n.9 (1993), the STRmix results defendant seeks to introduce fail the Daubert test and defendant should be precluded from introducing them at trial.

---

[1] "Tr." denotes the transcripts filed at Dkt. 739 and 740.

2

## II. FACTS

On March 23, 2021, Mr. Vines ran cotton swabs over two approximately palm-sized bags collected by investigators on March 10, 2016.  (Tr. 25-26.)  Mr. Vines labeled the swabs he collected from the first bag (which was seized from defendant's left shirt sleeve) as Pure Gold Forensics ("PGF") Item #2.  (Id.; "Item #2.")  Mr. Vines labeled the swabs he collected from the second bag (which was seized from defendant after it fell out of the bottom of his shirt) as PGF Item #3.  (Id.; "Item #3.")  On March 30 and 31, 2021, Mr. Vines extracted DNA from Item #2 and Item #3, which allowed him to quantify the amount of DNA he collected on March 23.  (Id. 68-69, Gov't Ex. 4.)  For Item #2, Mr. Vines determined that he collected approximately 20.7 total picograms of DNA.  (Tr. 69-71.)  Contained within those 20.7 picograms was approximately 4.6 picograms of male DNA.  (Tr. 71.)   For Item #3, Mr. Vines determined that he collected approximately 92 total picograms of DNA.  (Tr. 72.)  Contained within those 92 picograms was approximately 6.9 picograms of male DNA.  (Tr. 73.)

After those quantifications, on or about April 12, 2021, Mr. Vines amplified the samples collected from Item #2 and Item #3 using the Globalfiler PCR Amplification Kit manufactured by the company Applied Biosystems.  (Tr. 42-43, Def. Ex. E.)  After the samples were amplified, Mr. Vines ran them through an instrument that performed capillary electrophoresis to measure the height of any alleles detected in relative fluorescent units. (Tr. 40-41; "RFUs".)  Mr. Vines inputted that RFU data into a computer program called GeneMapper, which created an electropherogram for each sample.  (Tr. 43; Gov't Ex. 7, 8.)  After Mr. Vines examined the electropherogram

for Item #2, he determined that the DNA sample was "[c]onsistent [with] a mixture … of at least [two] contributors. [But] [d]ue to low-level DNA detection, profile not suitable for comparison using manual methods." (Gov't Ex. 7.) In other words, Mr. Vines did not compare defendant's DNA profile to the sample obtained from Item #2 and was unable to express an opinion about whether defendant contributed DNA to that sample. In contrast, after Mr. Vines examined the electropherogram from Item #3, he opined that "[a] partial mixture of [at] least [two] contributors [with] at least one male was detected. A major profile was deduced [at four] loci. [Defendant] excluded from major [profile]." (Gov't Ex. 8.) For the minor profile within the sample, however, Mr. Vines opined that "[d]ue to the uncertain number of contributors and the low level of DNA detected, the minor contributor profile is not suitable for comparison purposes." (Def. Ex. F.) As with the sample obtained from Item #2, then, Mr. Vines did not compare defendant's DNA profile to the minor profile in the sample obtained from Item #3 and was unable to express an opinion about whether defendant contributed DNA to that sample.

On July 29, 2021, PGF finalized its internal validation of STRmix. (Tr. 84-85; Def. Ex. G at 36.) Then, on August 9, 2021, Mr. Vines inputted the information obtained from the electropherogram generated for Item #3 into STRmix and STRmix generated three likelihood ratios. (Gov't Ex. 2 at 4.) On or about September 3, 2021, Mr. Vines composed a report where he adopted only one of those three likelihood ratios and stated that "[t]he mixture of DNA obtained from Item #3 is 24 times more likely if it originated from two unknown contributors than if it originated from [defendant] and

4

one unknown contributor." (Def. Ex. J at 2.) On August 30, 2021, Mr. Vines inputted the information obtained from the electropherogram generated for Item #2 into STRmix and STRmix generated three likelihood ratios. (Gov't Ex. 2 at 2.) In the same September 3 report discussed above, Mr. Vines adopted one of those three likelihood ratios and stated that "[t]he mixture of DNA obtained from Item #2 is 45 times more likely if it originated from two unknown contributors than if it originated from [defendant] and one unknown contributor." (Def. Ex. J at 2.)

**III. ARGUMENT**

    **A.   Mr. Vines is Unfit to Render an Opinion About STRMIX's Reliability in This Case**

STRmix is a probabilistic genotyping software ("PGS") program. "Probabilistic genotyping refers to the use of biological modeling, statistical theory, computer algorithms, and probability distributions to calculate likelihood ratios[.]" (Def. Ex. I at 2.) As such, in other criminal cases where courts have examined the reliability of STRmix, the proponent of STRmix evidence has usually offered the testimony of individuals who are deeply familiar with biological modeling, statistical theory, computer algorithms, and probability distributions. For instance, in both United States v. Gissanter, 900 F.3d 457 (6th Cir. 2021) and United States v. Lewis, 442 F.Supp.3d 1122 (D. Minn 2020), the government called Dr. John Buckleton, who is widely recognized as the "father" of STRmix to

5

testify about STRmix's core functions generally and STRmix's application to each case specifically.[2]

Here, the Court has only Mr. Vines' testimony to guide it. While Mr. Vines has years of experience in manual DNA interpretation, he is a very new user of STRmix. (Tr. 89-90.) His educational background is in biology and forensic science (Def. Ex. A at 1) and his only coursework in statistics consists of a single online course where the material covered did not include any of the statistical formulas used by STRmix. (Tr. 88-89.) There is no indication that he is published in the field of DNA analysis, much less probabilistic genotyping. (See Exhibit A.) He readily admitted that he is not a computer programmer, so he simply assumes that STRmix is creating appropriate calculations when he views its results. (Tr. 211-212.) When asked about the contents of Government's Exhibit 16 (a report composed by Dr. Buckleton and his colleague Duncan Taylor discussing the highest posterior density and database likelihood ratio analyses for Item #2 and Item #3) Mr. Vines admitted that "a lot of those terms and a lot of the meat, I would say, of that paper kind of went over my head because that's high-level statistical speaking." (Tr. 181-182.)

Additional portions of Mr. Vines' testimony demonstrate his lack of understanding of STRmix, which further render his opinions of the system's performance in this case meaningless. For instance, it is well settled that STRmix "does not measure the probability that the

---

[2] At the district court level in Gissanter, the court not only heard from Dr. Buckleton, it also appointed two independent experts to advise the court in making its reliability determination. In Lewis, the magistrate judge tasked with analyzing STRmix's reliability also appointed an independent expert to advise the court.

defendant in fact contributed to the DNA mixture." Lewis, 442 F.Supp.3d at 1140.  In other words, "an LR numeric value is not a measurement of a physical quantity.  Rather, it is a ratio of probabilities and is dependent on the specific propositions used to formulate it."  (NIST Report at 37.)  Mr. Vines' testimony on redirect demonstrates that he does not fully appreciate that nuanced fact.  Specifically, Mr. Vines agreed that the LRs for Item #2 and Item #3 reflected STRmix's findings about defendant's "degree of exclusion," from the evidence.  (Tr. 200.)  A cursory examination of the pertinent literature on PGS systems shows that formulation is fallacious.  (NIST Report at 37.)  But it is also contradicted directly by Mr. Vines' testimony and Government's Exhibit 1, which shows that PGF will not report that a defendant is "excluded" from a DNA mixture unless STRmix produces a LR less than or equal to .001. (Gov't Ex. 1 at 20; Tr. 111.)  "Inclusion" and "exclusion" are binary concepts and logic holds that there is no such thing as "degrees of exclusion."  In essence, Mr. Vines' redirect testimony demonstrates his belief that STRmix's LRs are reflections of physical quantities, which is patently untrue.

On the same note, Mr. Vines' testimony about his use of the most "conservative" LR produced by STRmix in his September 3, 2021, report was incorrect.  While Mr. Vines testified that PGF reports LRs based on the numerical value produced by STRmix truncated to the hundredth place, that is wrong.  (See Tr. 237-238.)  The LR values Mr. Vines reported for Item #2 and Item #3 are created only by truncating the numerical values produced by STRmix to the thousandth place.  First, with Item #2, Mr. Vines reported the LR as $2.2 \times 10^{-2}$, or .022, which STRmix produced using the FBI's Caucasian database.  (See Gov't Ex. 2

7

at 2.)  One divided by .022 is 45, which is reflected in the conclusion "[t]he mixture of DNA obtained from [I]tem #2 is 45 times more likely if it originated from two unknown contributors than if it originated from [defendant] and one unknown contributor."  (Def. Ex. J at 2.)  If PGF truncated STRmix's values to the hundredth place, Mr. Vines would have reported that the mixture was 50 times more likely if it originated from two unknown contributors because one divided by .02 is 50.  A cursory review of Government's Exhibit 2 and simple math shows that PGF reports LRs that are the farthest away from one, or the most favorable for defendant.[3]  That same policy is clear in Item #3, where Mr. Vines reported the LR from the FBI's Southwest Hispanic database, when the LRs reported by STRmix for the African American and Caucasian databases were closer to one.  (Gov't Ex. 2 at 4.)[4]

   Mr. Vines' lack of pertinent qualifications and demonstrated misunderstandings about STRmix render him unfit to opine on the reliability of the system in this case.  In fact, Mr. Vines basically admitted as much during cross-examination: when asked if he knew whether PGF's STRmix system was accurate when assessing DNA profiles that contain a minor contributor who contributed approximately one cell's worth of DNA, Mr. Vines replied "I don't know that."  (Tr.

---

[3] For Item # 2, STRmix produced an African American database LR of $2.5 \times 10^{-2}$ (.025) and a Southwest Hispanic database LR of $2.7 \times 10^{-2}$ (.027).  (Gov't Ex. 2 at 2.)  One divided by .025 is approximately 40 and one divided by .027 is approximately 37.

[4] The exhibit shows an African American database LR of $6.9 \times 10^{-2}$ (.069) and a Caucasian database LR of $6.1 \times 10^{-2}$ (.061).  One divided by .069 is approximately 14 and one divided by .061 is approximately 16.  The fact that Mr. Vines reported a result from the FBI Caucasian database for Item #2 and the FBI Southwest Hispanic database for Item #3 demonstrates that PGF's policy is to report the LR that is farthest from one (as opposed to reporting a number that is closest to one or always from the same FBI database).

8

110.)  Since defendant bears the burden of proof on the issue of reliability, his total reliance on an unqualified witness means he has not carried that burden and the STRmix LRs for Item #2 and Item #3 should be excluded from trial on that basis alone.

### B. Defendant Failed to Produce Evidence Demonstrating That The Inputs Used by STRmix Were Accurate

Even if Mr. Vines was qualified to render an opinion on the reliability of STRmix in this case (he is not), his testimony would still be deficient.  In the first instance, that deficiency stems from the fact that Mr. Vines' testimony failed to provide the Court with evidence demonstrating the ability of PGF's Globalfiler DNA typing kit to provide accurate data with low template DNA samples like the ones at issue here.

Since defendant is male, any DNA analysis in this case must be focused on the miniscule quantities of male DNA collected from Item #2 and Item #3: 4.6 picograms and 6.9 picograms, respectively.  (Tr. 71, 73.)  Those tiny amounts present concerns about whether PGF's Globalfiler system accurately identified the alleles present in that male DNA.  Because as described by Mr. Vines on cross-examination, he fed "STRmix the actual numbers that [the] electropherogram [was] displaying."  (Tr. 133.)  Accordingly, for STRmix to produce accurate results, the numbers it uses must be accurate as well.  On this record, the Court is left to guess whether PGF's Globalfiler system is capable of accurately detecting alleles in a DNA mixture with

9

template amounts as low as the male template amounts in Item #2 and Item #3.[5]

While a summary of PGF's internal validation of its Globalfiler kit was introduced as Defense Exhibit E, that document mostly discusses PGF's efforts to determine the effectiveness of the system's allele detection capabilities using single-source profiles. (Def. Ex. E at 2; Tr. 75.)  Defendant introduced no evidence to demonstrate the system's ability to reliably identify alleles in multiple-contributor mixtures like the ones at issue here.  Instead, the evidence shows that PGF's Globalfiler system was operating outside its validated limits <u>for even single-source profiles</u>.  (Tr. 75, "Q: So you indicated, for a single source profile, that partial DNA profiles were obtained down to 7.8 picograms of one sample?  A: Yes.")  In this circumstance, the Court is left to guess whether the data contained in the electropherograms for Item #2 and Item #3 is accurate.  More pointedly, the Court can only speculate about whether any of the data contained in those exhibits is even from the male portion of the DNA mixtures obtained from Item #2 and Item #3.

This complete absence of evidence should concern the Court because Applied Biosystem's published validation study for the Globalfiler system supports the argument that PGF's system was

---

[5] Here, it should be noted that Mr. Vines' re-direct examination demonstrated a blithe disregard for this fundamental truth about STRmix.  When asked whether the PGF's stochastic threshold of 150 RFUs has any relevance to STRmix's analysis, Mr. Vines replied "the actual stochastic threshold … has no relevance to STRmix."  (Tr. 220.)  That is wrong.  As described by Mr. Vines himself on cross-examination, PGF's Globalfiler system may fail identify alleles below 150 RFUs. (Tr. 48).  If STRmix is provided with incomplete data, it would, by definition, create an unreliable result.  This amounts to additional evidence of Mr. Vines' lack of understanding of STRmix, on top of the problems identified in Section III.A above.

operating outside its limits when it analyzed the DNA mixtures obtained from Item #2 and Item #3. In particular, the study states that "[a]t 15.6 picograms, less than 3 alleles on average were returned[.]" Matthew J. Ludeman, et al., <u>Developmental validation of Globalfiler PCR amplification kit: a 6-dye multiplex assay designed for amplification of casework samples</u>, 132 Intl J Legal Med 1555, 1565 (2018).[6] That makes the problem of allele detection in the male portions of the DNA mixtures here particularly acute, and Mr. Vines' testimony was devoid of any information that could shed light on that issue. In fact, Mr. Vines could only venture a guess about where PGF's internal validation stopped when evaluating mixed samples. (Tr. 241, "Q: [Y]ou can't tell us whether your internal validation contained any samples where the minor contributor contributed less than seven picograms of DNA? A: No. I believe we went down to 65 picograms in our mixture studies.") As such, defendant has failed to show that the alleles displayed on the electropherograms were from the male portions of the DNA in Items #2 and #3 and has therefore failed to prove that the information Mr. Vines fed into STRmix reflects data gleaned from the only parts of the DNA profiles that have any relevance to this case. Those failures poison STRmix's LRs for Item #2 and Item #3 and any evidence of those LRs should be excluded from evidence at trial.

**C. Defendant Failed to Produce Evidence Demonstrating That STRmix's LRs For Item #2 and Item #3 Were Reliable**

Even if the Court sets aside the issues identified in Sections III.A and III.B above, defendant would still fail to carry his

---

[6] With this finding in mind, it is possible the Globalfiler system did not detect any alleles in the male portion of the DNA contained in Item #2 and Item #3.

11

burden.  Absent from the record is any evidence that demonstrates that STRmix produces reliable LRs with profiles like the ones at issue here.

In 2015, President Obama tasked the President's Council of Advisors on Science and Technology ("PCAST") with evaluating the scientific validity of six areas of forensic science that rely on feature comparison, including DNA analysis.  As part of that assessment, PCAST examined STRmix and stated in a 2016 report that the program "appear[ed] to be reliable for three-person mixtures in which the minor contributor constitutes at least 20 percent of the intact DNA and in which the DNA amount exceeds the minimum level required for the method."  President's Council of Advisors on Science and Technology, <u>Forensic science in criminal courts: ensuring scientific validity of feature-comparison methods</u> 82 (2016) obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf.  Further validation testing needed to be performed on DNA samples outside that range – what PCAST referred to as "complex mixtures" – before STRmix's performance could be deemed reliable for those types of samples.  <u>Id.</u>  In a 2017 addendum to its 2016 report, PCAST stated that further STRmix validation testing needed to be performed on "complex samples" as well:  samples, like the ones here, "with low amounts of template, substantial degradation, or significant PCR inhibition."  President's Council of Advisors on Science and Technology, <u>An addendum to the PCAST report on forensic science in criminal courts</u> 9 (2017), obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensics_addendum_finalv2.pdf.  Ultimately, PCAST recommended that "when considering the admissibility of testimony

12

about complex mixtures (or complex samples) judges should ascertain whether the published validation studies adequately address the nature of the sample being analyzed (e.g., DNA quantity and quality, number of contributors, and mixtures proportions for the person of interest)." Id.

Then, in August 2021, the National Institute of Standards and Technology published a report that "explore[d] what is known about the limits of DNA mixture interpretation methods, including probabilistic genotyping software systems." (NIST Report at 14.) The report adopted the term "*factor space* to describe the totality of scenarios and associated variables (*factors*) that are considered likely to occur in actual [DNA] casework." (NIST Report at 60.) After reviewing data that detailed factor space coverage in numerous validation studies for various PGS systems, NIST concluded that "[c]urrently, there is not enough publicly available data to enable an external and independent assessment of the degree of reliability of DNA mixture interpretation practices, including the use of [PGS] systems." That conclusion is unsurprising. A cursory look at the data compiled by NIST shows that the available information from both peer-reviewed and internal validation studies is shockingly sparse when describing the precise qualities of the mixtures tested in those studies. (See NIST Report at 66-74.) In other words, the scientific literature has mostly failed, even in the wake of the PCAST reports, to define where PGS system limits lie for both complex mixtures and complex samples.

The NIST findings should concern the Court because the record here is devoid of any evidence that describes the reliability of STRmix (generally, or for PGF specifically) for samples comparable to

Item #2 and Item #3. Instead, as noted above, when asked on cross-examination if he knew whether PGF's STRmix system was accurate when it analyzes a DNA profile that contains a minor contributor who contributed approximately one cell's worth of DNA, Mr. Vines replied "I don't know that." (Tr. 110.) To be sure, on re-direct Mr. Vines asserted that he believed the likelihood ratios he reported for Item #2 and Item #3 were reliable. (Tr. 198 (Item #2); Tr. 200 (Item #3).) But those conclusory statements are totally meaningless in the face of the discussion in Section III.A. As such, the record contains no evidence that demonstrates the LRs defendant seeks to admit are reliable. See General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)(describing that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.")

    On that same account, there is additional troubling evidence in the record. Government's Exhibit 2 contains handwritten notes from Mr. Vines' colleague Suzanna Ryan that indicated for Item #2, "STRmix [did not] … describe the observed data very well. [L]ikely due to extreme low level of data and obv[ious] allelic [dropout] at all loci examined." (Gov't Exhibit 2; Tr. 158-159.) When confronted with these notes on cross-examination, Mr. Vines acknowledged that "STRmix [was] not able to describe the observed data very well[,]" (Tr. 159) but never explained why he reported the result for Item #2 in the face of that deficiency. Whether STRmix "observed the data … well" is the precise question at the heart of this dispute. Since defendant produced no evidence demonstrating that STRmix is accurate when evaluating profiles like the ones at issue here, the Court must

rely on Mr. Vines' word about STRmix's performance to find that it produced accurate results under Daubert. As discussed in Section III.A, that is a bridge too far. Defendant has failed to satisfy his burden of proof and the Court should exclude both LRs from evidence at trial.

### D. Cross-Examination Evidence Further Calls Into Question the Reliability of the LRs for Item #2 and Item #3

When confronted on cross-examination with Government Exhibit 10, Mr. Vines admitted that STRmix has been shown to produce exclusionary LRs for true contributors when it analyzes low-template DNA samples. (Tr. 102-107.)[7] And while he acknowledged that PGF's validation study tested for whether PGF's STRmix system reliably <u>excluded non-contributors</u> to known samples (Tr. 104-105), he could not say whether PGF's validation study tested for whether its system reliably <u>included true contributors</u> to known samples. (Tr. 105.) If PGF had in fact tested those scenarios, there would be no reason to expect its results to differ from those contained in Government Exhibit 10. Furthermore, if PGF's internal validation contained figures demonstrating how often its STRmix system produced LRs below one for true contributors to DNA mixtures, those figures would have aided the Court in determining whether the profiles at issue here are comparable to the profiles that produced those misleading LRs. As the record stands, however, the Court is left to guess. So while it

---

[7] More specifically, Figure 4 in Government's Exhibit 2 shows that STRmix's propensity to produce exclusionary LRs for true contributors increases as average peak height decreases. That phenomenon becomes particularly acute when the average peak height of the profile is between zero and 50 RFUs. For Item #2, STRmix estimated that the average peak height of the minor contributor profile was 17 RFUs (Gov't Ex. 2 at 1). For Item #3, STRmix estimated that the average peak height of the minor contributor profile was 23 RFUs (Gov't Ex. 2 at 3.).

is undisputed that STRmix is capable of producing misleading LRs with low template mixtures, the Court has no evidence to help guide it in determining whether the tiny male profiles analyzed here were susceptible to such mischaracterization.

Those facts are particularly concerning when viewed alongside other evidence produced during Mr. Vines' cross-examination. As seen in Government's Exhibits 14 and 15, changing the number of assumed contributors to a DNA mixture in STRmix can drastically alter the LRs the system produces.[8] Here, Mr. Vines described the DNA mixtures in Item #2 and Item #3 as containing "at least [two] contributors[.]" (Def. Ex. J at 1-2.)[9] Then, Mr. Vines admitted on cross-examination that Government's Exhibit 8 demonstrated the possibility that there were three contributors to the DNA mixture obtained for Item #3. (Tr. 167-168.) Despite these noted uncertainties, and despite his ability to simultaneously run the system for two and three contributors (Tr. 168), Mr. Vines chose to identify both mixtures in STRmix as two-person. This should concern the Court because underestimating the number of contributors in STRmix "tends to 'provoke' exclusion of known contributors." Lewis, 442 F.Supp.3d at 1158. And on this record, the Court has no evidence to determine how often Mr. Vines errors in his estimation of the number of contributors to low-template DNA mixtures.[10] Without that evidence,

---

[8] When Mr. Vines used four contributors as his input for PGF Item 4E and 4F, STRmix produced a LR of 63,000. (Gov't Ex. 14; Tr. 170.) When he used five contributors as his input for the same sample, STRmix produced a LR of 10. (Gov't Ex. 15; Tr. 171.)

[9] And for Item #3, he indicated originally that the number of contributors was "uncertain." (Def. Ex. F at 2.)

[10] The government requested Mr. Vines' proficiency testing data from defendant, but never received it. In cross-examination, Mr.
*(footnote cont'd on next page)*

there is no way to have c]onfidence in Mr. Vines' choice to run Item #2 and Item #3 as two person mixtures in STRmix. Under these precise conditions in Lewis, the court chose to find an exclusionary STRmix LR unreliable. Lewis, 442 F.Supp.3d at 1159 ("Given that [the testing lab] is likely to underestimate the number of actual contributors to [DNA mixtures], and given that underestimation leads to false exclusions of contributors at an unknown error rate, this evidence of exclusion is not reliable.") The Court should follow suit here.

### E. Case Law Does Not Help Defendant

While the court in Lewis excluded evidence of an LR similar to the ones at issue here, the Sixth Circuit in Gissanter reversed the district court's conclusion that the government failed to demonstrate that STRmix was foundationally reliable and reliable as applied to the case. Gissanter, 909 F.3d at 470. Gissanter can be distinguished from this case on several fronts.

First, the court there was examining an inclusionary STRmix LR with an extremely high value (49 million). Id. at 462. As the court noted, "based on an analysis of the DNA of 300,000 people who were known not to be in a mixture, … STRmix had accurately excluded the non-contributors 99.1% of the time." Id. at 465.[11] We have no

---

Vines indicated he has engaged in proficiency testing, through a company called Collaborative Testing Services, or CTS. (Tr. 172.) But, as noted in the NIST Report, "CTS DNA mixture performance tests involve single-source or two-person mixtures created from large quantities of DNA (hundreds to thousands of cells). In other words, the mixtures … are not complex." NIST Report at 78.

[11] This is unsurprising, since "[t]he software … errs in the direction of the innocence of criminal suspects by making conservative estimates about the probability of a genetic pattern occurring." Id. at 467. That feature counsels against accepting the LRs for Item #2 and Item #3 at face value – the system is biased toward exclusion.

17

comparable study in the record here.  Instead, the record contains Government's Exhibit 16, which is a report composed by Dr. Buckleton that discusses database likelihood ratios for Item #2 and Item #3. That report shows that STRmix's analysis of Item #2 would produce an exclusionary LR for a true contributor to the mixture between 25% to 28% of the time, depending on which FBI database is used for comparison.  (Gov't Ex. 16 at 3.)  For Item #3, the report shows that STRmix's analysis would produce an exclusionary LR for a true contributor to the mixture between 11% to 13% of the time, depending on the FBI database.  (Gov't Ex. 16 at 5.)  Those rates should are intolerably high and remove the profiles at issue here from the ambit of the analysis in Gissanter.

Additionally, the profile discussed in Gissanter contained 49 picograms of DNA, significantly more than the male profiles developed from Item #2 and Item #3.  Gissanter 909 F.3d at 462.  And the court there based its reliability finding partially on the fact that the DNA laboratory tested similar-sized profiles during its internal validation.  Id. at 467.  As discussed above, there is no comparable evidence in the record here.  And the court specifically endorsed the internal validation procedure of the testing lab because it had undergone an audit performed by the FBI.  Id.  No such external audit took place here (Tr. 23-24, 90), so once again, the Court can only take Mr. Vines' word about the sufficiency of PGF's testing protocols.  The court in Gissanter was not forced to travel the same route, and the case is easily distinguishable from the facts here.

**IV.  CONCLUSION**

As noted earlier, Mr. Vines' confidence about the LRs at issue here appear to stem from his belief that STRmix does not have

1 reliability limits.  On cross-examination, he stated "I believe
2 [STRmix] still accurately models, just because it follows that
3 pattern of the degradation. … So if we detect any DNA, I still
4 believe that STRmix officially models those low levels[.]"  (Tr.
5 242.)  That defies logic, but it also defies the relevant scientific
6 studies.  As noted in the NIST Report,

> Results from PGS systems do appear to demonstrate *trends* that
> LR values decrease with less information; either with lower
> quantities of DNA template … or with greater allele
> sharing[.] … However, such "sanity checks" with observed
> trends in LR values do not demonstrate the reliability of a
> specific LR number.

NIST Report at 82.

That observation fully captures the infirmities in defendant's presentation.  Whether STRmix can reliably analyze the types of profiles at issue here is (at best) an open question.  With the burden of proof squarely on him, defendant must answer that question before the LRs he seeks to admit can be introduced at trial.  Since
//
//
//

he has failed to do so, the Court should grant the government's motion and exclude the STRmix LRs for Item #2 and Item #3 from evidence at trial.

Dated: November 10, 2022          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


          /s/
SHAWN T. ANDREWS
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA